Richard SKVARCH, Appellant,

v.

Paulette SKVARCH, Appellee.

No. S–5690.

Supreme Court of Alaska.

July 8, 1994.

---

Allan Beiswenger, Robinson, Beiswenger & Ehrhardt, Soldotna, for appellant.

Peter F. Mysing, Kenai, for appellee.

Before MOORE, C.J., and RABINOWITZ, MATTHEWS and COMPTON, JJ.

## OPINION

MATTHEWS, Justice.

Richard Skvarch seeks to modify his obligation to pay Paulette Skvarch $500 a month for thirty-six months under a property settlement agreement reached between the parties in connection with their divorce.

Richard and Paulette Skvarch were divorced April 23, 1992, after twenty-six years of marriage. At the time of the divorce decree Richard resided in Alaska, where he earned in excess of $100,000 per year, and Paulette lived in Pennsylvania, where she was being trained as a medical stenographer. The Skvarchs' marital property was divided between them according to the terms of a property settlement agreement they had reached. The agreement awarded Paulette assets with a total value of $108,308.09 and Richard assets with a total value of $81,-372.27.[1] Paulette's total includes $18,000 for "temporary rehabilitative alimony in the sum of $500.00 per month, without interest, for a period of thirty-six months, commencing on the 10th day of the month following the entry of a decree of divorce herein." Similarly, Richard's total property distribution includes an $18,000 credit for "temporary rehabilitative alimony" payments to Paulette.

On February 3, 1993, Richard moved to modify the decree of divorce to eliminate his obligation to pay rehabilitative alimony. In support of this motion, Richard alleged that Paulette had completed her vocational training, had obtained employment as a medical secretary, and had remarried and that therefore the purpose for the rehabilitative alimony no longer existed.[2] Paulette opposed this motion, arguing that the monthly "rehabilitative alimony" payments were part of the parties' property settlement, that vacating the payments would render the settlement inequitable, and that even if the payments were alimony, they were just and necessary to her rehabilitation.

The superior court denied Richard's motion to modify the divorce decree. In a footnote, the court found "that these are rehabilitative alimony payments." Richard appeals.[3]

This court has recognized that "[w]here a support provision is an integral part of the property settlement, courts generally hold that the support provision is not subject to later modification." *Keffer v. Keffer*, 852 P.2d 394, 397 (Alaska 1993) (citing John J. Michalik, Annotation, *Divorce: Power of Court to Modify Decree for Alimony or Support of Spouse Which Was Based on Agreement of Parties*, 61 A.L.R.3d 520, 590 (1975)); *see also Voyles v. Voyles*, 644 P.2d 847, 849–50 (Alaska 1982) ("We wish to make

---

1. This is a 57.1%/42.9% division in favor of Paulette.

2. Paulette has not denied any of these allegations.

3. A trial court's denial of a motion to modify a support obligation is reviewed for an abuse of discretion. *Hinchey v. Hinchey*, 722 P.2d 949, 954 (Alaska 1986). This court will find an abuse of discretion only if it is "left with a definite and firm conviction, after reviewing the whole record, that the trial court erred in its ruling." *Id.* (quoting *Jones v. Jones*, 666 P.2d 1031, 1035 (Alaska 1983)).

it clear, however, that this rule [requiring termination of alimony on remarriage] does not apply ... where the award is an integral part of a property settlement and thus a property right vested in the dependent spouse...."). The primary question, therefore, is whether the payments provided for were integrated into the property settlement or are part of a separable provision. Alimony payments are integrated into the property settlement when they constitute part of the consideration given for other property benefits. *Keffer*, 852 P.2d at 399 (Rabinowitz, J., dissenting) ("Integration ... is grounded on the theory that spousal support was, at least in part, negotiated as a 'trade off' for [other property benefits]."). Where a party receives alimony in exchange for claims on other property, it would be unjust to modify the alimony while leaving the remaining property distribution untouched. We conclude that the "rehabilitative alimony payments" are an integral part of the division of property.

First, the payments are provided for in an exhibit to a document titled "Property Settlement Agreement." The agreement refers to the exhibits as distributing "the real and personal property acquired during this marriage." The payment provision is not treated any differently than any other asset.

Second, the settlement agreement exhibits include the full amount of all payments as Paulette's property, and also reduce Richard's property total by the full amount of all payments. This strongly indicates that the payments were primarily intended to balance the property division.

Third, if these payments are excluded from the property calculations, Richard receives $9,064.18 (or 4.78%) more property than Paulette. This might be considered an inequitable division, given Richard's far greater earning capacity.[4] *See, e.g., Ramsey v. Ramsey,* 834 P.2d 807, 810 (Alaska 1992) (authorizing superior court on remand "to adjust property division if equitably required" after rehabilitative alimony award was vacated); *Dixon v. Dixon,* 747 P.2d 1169, 1173 (Alaska 1987) ("When a couple has sufficient assets, the spouse with the smaller earning capacity can and should receive a larger share in the property distribution to aid him or her in this transition.").

Fourth, neither the property settlement agreement nor the parties' settlement correspondence explicitly links the monthly payments to Paulette's rehabilitation efforts. The agreement also does not explicitly provide that the payments would be subject to subsequent modification. While Paulette's original suggestion of monthly payments did refer to them as "spousal support," it also required that the principal amount be backed by a deed of trust on the marital residence and that interest be charged. Richard's counter-proposal reduced the principal amount to $12,000, eliminated the interest charge, and proposed to either place the money in a trust account or prepay the entire amount.[5] Apparently, the phrase "temporary rehabilitative alimony" was first used to describe the payments in the final property settlement agreement.

Fifth, it appears that Richard and Paulette negotiated the period of time over which the payments were to be made as part of their property settlement. Paulette originally suggested $500 per month for forty-eight months, for a principal amount of $24,000. Richard counter-proposed $500 per month for twenty-four months, or $12,000. The final agreement calls for $500 per month for

4. The parties are, of course, free to agree to any division of property, even one which this court might view as inequitable if made by the superior court. *Murphy v. Murphy,* 812 P.2d 960, 965 (Alaska 1991). However, the inequity of the property settlement if the payment provision is treated separately is some evidence that the payment provision was integral to the actual agreement. We also note that Paulette *rejected* as inequitable a settlement proposal from Richard which was identical to the settlement agreement without the payment provision.

5. Richard's insistence in his counter-proposal that Paulette acknowledge that his proposed $12,000 payment was "prepaid spousal support" does not necessarily indicate anything more than Richard's desire to secure certain tax advantages as part of the settlement agreement. *See* Internal Revenue Code §§ 71(a), 215. His proposals to either prepay the amount or deposit it into a trust account are not consistent with a belief that the payments would be subject to later modification.

thirty-six months, or $18,000. All versions explicitly set out the principal amount of payment and use it to adjust the property settlement.

Sixth, there appear to be particular reasons based on the circumstances of the parties for using alimony-type payments to adjust the property settlement, rather than simply providing for the different needs of the parties entirely through the property division.[6] Although the Skvarchs had accumulated substantial marital assets, a significant amount of these assets were in Richard's ARCO accounts.[7] The remaining assets apparently were also largely in Richard's possession in Alaska. In July 1991, Richard informed Paulette that only $73,000 could be withdrawn from his ARCO accounts while he was still employed.[8] This restriction set an upper limit on how much of Paulette's share of the Skvarchs' marital assets could come from the ARCO accounts. The nature and location of most of the couple's remaining assets made them ill-suited for use in properly balancing the property division. Therefore, it was logical for the parties to rely on payments from future income to better balance the settlement.[9]

Seventh, the purpose Richard now claims for the rehabilitative alimony ("allowing [Paulette] to relocate, and go back to school to receive training as a medical secretary so that she could find suitable employment to support herself at an acceptable standard of living") would not support the alimony provision as originally formulated.[10] At the time that Richard entered the agreement, Paulette's attorney had notified him that Paulette had already relocated to Pennsylvania and that she had begun a one-year course of study toward becoming a medical secretary at least eight months before. Under these circumstances, Richard could not reasonably believe that thirty-six monthly payments were for future relocation and training assistance.

These indications that the monthly payments were an integral part of the Skvarchs' property settlement outweigh the countervailing indications, which are 1) the fact that the payments are called "temporary rehabilitation alimony" in the settlement agreement and 2) the references to the payments as "spousal support" in the letters negotiating the settlement.[11] Courts which have applied the "integration doctrine" have found payment provisions integrated even where the payments were called "spousal maintenance" or "alimony," so long as there was evidence that the payments were given in exchange for reduced property claims. See, e.g., States v. States, 124 Ariz. 189, 603 P.2d 81, 82 (1981) ("The fact that the word 'alimony' is used is not dispositive of whether in fact the payments were for temporary support or as consideration for relinquishment of all claims

6. This court has expressed a preference for fully providing for both parties through property division if possible, without a need for additional alimony payments. See Schanck v. Schanck, 717 P.2d 1, 5 (Alaska 1986). The court has recognized, however, that under certain circumstances, it is not possible to equitably provide for both parties through division of property alone. See Dixon, 747 P.2d at 1173–74 (recognizing possibility that where substantial marital assets were burdened by substantial debt, " 'reorientation alimony' may be the only feasible method of achieving an equitable resolution of the parties' financial affairs"); Laing v. Laing, 741 P.2d 649, 654 (Alaska 1987) (affirming trial court's order that husband make loan payments for two years on property awarded wife, because such alimony was just and necessary so that wife could avoid foreclosure of property awarded her).

7. Richard's ARCO accounts contained a total of $118,982.66, or 62.73% of the couple's total assets.

8. The final property settlement agreement did grant Paulette close to $73,000 from the ARCO accounts.

9. This is not to say that these reasons would necessarily support a court order of alimony rather than a property division more favorable to Paulette. However, they do support a conclusion that the Skvarchs intended the monthly payments to adjust the equities of the property division, rather than as true "rehabilitative alimony."

10. In addition, Richard's statements in his affidavit concerning the purpose of the payment provision are merely statements of his subjective intent with little probative value. See Keffer, 852 P.2d at 398.

11. Other than Richard's self-serving affidavit testimony as to the purpose of alimony provision, there is no other evidence indicating that the provision was intended to be separable.

to community property."); *Keller v. Keller,* 137 Ariz. 447, 671 P.2d 425, 426–27 (App. 1983) (allowing party to "consistently maintain that the payments were alimony" and still contend "that the alimony couldn't be altered because it was given in consideration of the property settlement"); *Kiffer v. Kiffer,* 410 N.W.2d 454, 457 (Minn.App.1987) ("[A] dissolution provision ordering monthly payments termed 'alimony' or 'maintenance' but bearing the characteristics of a property settlement, is ambiguous.").

The superior court's order denying Richard Skvarch's motion to modify his obligation to pay Paulette Skvarch $500 a month for thirty-six months is AFFIRMED. The provision requiring the monthly payments is an integral part of the Skvarch's property settlement and therefore is not modifiable based on a change in Paulette's circumstances.

BURKE, J., not participating.